# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WISCONSIN

In re:

Cenergy, LLC, *et. al.*,

Case No. 23-11558-cjf
Chapter 11

Debtors[1].

## DEBTORS' JOINT DISCLOSURE STATEMENT

**Dated:**         February 26, 2024

Approved:        [ * ] (not yet approved / approval pending)

Plan Proponent:   Debtors, by Counsel
                  Craig E. Stevenson
                  **DEWITT LLP**
                  Two East Mifflin Street, Suite 600
                  Madison, WI  53703-2865
                  608-252-9263
                  ces@dewittllp.com

---

[1] Jointly administered with Case No. 23-11559 *Cenergy II, LLC*, and Case No. 23-11560 *Consumers Cooperative Association of Eau Claire*.

I. **Introduction**

Debtors Consumers Cooperative Association of Eau Claire ("CCA"), Cenergy, LLC ("Cenergy") and Cenergy II, LLC ("Cenergy II") each commenced a bankruptcy case (the "Cases") by filing voluntary petitions for Chapter 11 bankruptcy relief on September 1, 2023 (the "Petition Date"). On September 7, 2023, the Court granted the Debtors' motion to jointly administer the Cases. See Dkt. #38[2].

This Disclosure Statement describes the background of the Debtors, the events that led to the filing of these Cases, the financial status of the Debtors during the Cases up to this point, an overview of the treatment of creditors under the Debtors' proposed Plan of Reorganization (the "Plan"), and the anticipated means for implementing the Plan and its provisions. This Disclosure Statement was prepared by the Debtors, their managers, and attorneys. All statements in this Disclosure Statement are the Debtors' representations, and do not reflect the statements or opinions of the Court or any other party.

The Debtors received approval of this Disclosure Statement by the Bankruptcy Court for the Western District of Wisconsin (the "Court") under Section 1125(b) of the Bankruptcy Code. At the hearing on the Disclosure Statement, the Court determined that this Disclosure Statement contains adequate information to enable the holders of claims in these Cases to make informed judgments about whether to accept or reject the Plan. The Court's approval of the Disclosure Statement is not a recommendation or approval of the Plan.

This Disclosure Statement includes summaries of certain Plan terms and provisions; however, the Plan itself must be consulted as to all specific Plan terms and provisions. If the Plan and this Disclosure Statement are inconsistent in any way, the terms of the Plan control. This Disclosure Statement may be relied upon only for the purpose of determining whether to vote to accept or reject the Plan, and not for any other purpose. Nothing contained in this Disclosure Statement is: (a) an admission of any fact or liability by any party, (b) admissible in any proceeding involving the Debtors or any other party, and (c) not conclusive as to the tax or other legal effects of the reorganization on the Debtors. Certain statements in this Disclosure Statement are forward-looking, and thus by their nature contain estimates and assumptions that may vary from actual outcomes.

Any capitalized terms not defined in this Disclosure Statement are defined as set forth in the Plan.

Accompanying this Disclosure Statement are copies of the following, which constitutes service of these documents:

1. The Plan;
2. The Court's order approving this Disclosure Statement and setting certain dates and deadlines for confirmation of the Plan;
3. The Court-approved Ballot to accept or reject the Plan (the "Ballot"), to be used by parties entitled to vote on the Plan.

---

[2] All docket references are to the main case (Cenergy, LLC, Case No. 23-11558) unless otherwise noted.

2

The Court has set a hearing on confirmation of the Debtors' Joint Plan of Reorganization (the "Confirmation Hearing") for **[ * ].** The Confirmation Hearing date and time may be adjourned by the Court without further notice except for the announcement of the adjournment made at the hearing.

The Court has directed that all Ballots be returned to Debtors' counsel on or before **[ * ]**. The Court has also directed that objections, if any, to confirmation of the Plan must be served and filed with the Court on or before **[ * ].** See *Order Approving Disclosure Statement and Setting Hearing and Deadlines for Plan Confirmation*, Dkt. # [ * ].

## II.   Debtors' background and events leading to filing.

*(A)  Background*

The Debtors operate gas station convenience stores in the Eau Claire area and surrounding communities in Western Wisconsin. At the commencement of the case, the Debtors operated a total of 31 stores, but immediately rejected leases for 13 under-performing stores and closed those 13 stores within the first few weeks after the Petition Date. Prior to the Petition Date, the Debtors' management determined that continued operations of the 13 under-performing stores would eventually drain the resources of all 31 stores which would lead to the eventual failure of the entire company. Thus, a primary objective of these Cases was to efficiently cease operations at the under-performing stores, and to reorganize the Debtors' going forward operations around the remaining profitable stores.

The Debtors trace their roots back to 1935, when CCA was founded as the Eau Claire Farmer-Labor Cooperative Association by 67 local residents who joined together to buy a train carload of coal to heat their Wisconsin homes. The next year (in 1936) the co-op changed its name to Consumers Cooperative Association of Eau Claire (CCA) and acquired a two-pump gasoline station on Wisconsin Street in downtown Eau Claire. A "super-station" was added in 1940 to provide motor service and lubrication. In 1946, an appliance department was added with one of the best appliance service departments in the area. A coal yard and a bulk petroleum plant were purchased in 1946 along with four trucks to deliver coal and petroleum.

From there CCA expansion spread to the Highland Avenue area of Eau Claire's East Hill in 1948, bringing groceries and general merchandise to a former roller-skating rink housed in a Quonset hut. Land acquisitions allowed for further development of the Co-op Shopping Center. Numerous more building and department additions followed, including gas stations and additional locations in surrounding communities.

In the 1980's CCA exited the hardware, clothing, and furniture business and returned to its roots of selling groceries and petroleum. By the early 2000's CCA operated 19 convenience stores in the Eau Claire and Chippewa Falls area and began operating as "Mega! Holiday" in 2008.

In early 2016 CCA sold its grocery division and acquired 14 additional stores in Western and Southwestern Wisconsin that are also operated as Mega! Holiday locations. In October of 2016, an additional five locations under the Travel Stop name were acquired. Thus, as of the

3

Petition Date, the CCA and its affiliates, Cenergy, LLC and Cenergy II, LLC, operated 31 convenience stores.

As a stock cooperative, CCA has approximately 795 stockholder members that each own a single share entitling the holder to attend the annual cooperative meeting and to cast a single vote in the election of CCA's board of directors. Stockholders are not permitted to own multiple shares or cast multiple votes. No dividends have been paid on the stock since 2009. The affairs of CCA are governed by its board of directors elected by the stockholder members.

CCA also has over 20,000 non-stock cooperative members. To maintain eligibility for non-stock member status, members must purchase $500 per year in qualifying goods and services. CCA may terminate non-stock membership of members that do not meet the required purchase amount for two consecutive fiscal years (or more). Non-stock members receive a $0.05 per gallon discount on gas, various cents-per-gallon (CPG) fuel discounts earned by purchasing qualifying products, and automatic discounts offered on qualifying products during promotional periods (the "Co-op Benefits"). Non-stock members do not have voting rights, receive no dividends, member interests have no par or other value, and are non-transferable.

Both Cenergy, LLC and Cenergy II, LLC were formed in 2003. Cenergy, LLC has been a wholly-owned subsidiary of CCA since its formation. Initially, CCA had a 51% stake in Cenergy II, but took over 100% ownership in 2007. Since then, CCA has been the sole member of both Cenergy and Cenergy II.

*(B) Overview of Debtors' Recent Operations*

The Debtors operate as one integrated business, with centralized management and consolidated financials. Bank accounts for all of the Debtors' individual store locations funnel sales proceeds to a central operating account (in the name of Cenergy) to pay expenses for operations of all the Debtors' stores. Nearly all vendors and suppliers of the Debtors bill or invoice the Debtors in the name of "Cenergy." The integrated nature of the Debtors and their stores means that underperforming stores are a drag and a drain on the healthier stores. As previously noted, the Debtors' management viewed closing the 13 underperforming stores as a key to the Debtors' future success. The Debtors own the real estate for four of their store locations, with the other locations leased from various landlords.

The Debtors are parties to a franchise agreement with Holiday Stationstores ("Holiday"), which covered 23 of the 31 stores operating as of the Petition Date. Holiday's affiliate Indianhead Oil is also the landlord for five of the store locations. In connection with Holiday's franchise agreement for the Holiday-branded stores, Holiday is also the fuel supplier, supplier of certain inventory for the stores, and handles processing of credit card receipts. For the Holiday franchise stores, Holiday initially processes and retains all credit card sale proceeds, sets those off against invoices for fuel and other inventory, and for improvements to the stores as required by the Holiday franchise agreements, and then remits the net to the Debtors. That process has continued post-petition, and the Debtors' sales are sufficient to maintain coverage of the Holiday charges.

4

For the non-Holiday stores, the Debtors purchase fuel from various independent fuel suppliers, using a similar process: the fuel suppliers initially process and retain credit card receipts, set off the receipts against fuel purchases, and remit the net to the Debtors.

The Debtors' cash receipts from sales at all stores are deposited daily at banks local to each store, and then those accounts are swept daily to a central operating account, where any net credit card receipts are also deposited. From that central account, all operating expenses of the Debtors are paid. As such, even though the Debtors each operate several stores, all the stores are treated as one common enterprise. Cenergy, LLC is effectively the hub of the Debtors in terms of collecting sales from all stores and paying vendors and other creditors. Most creditors bill Cenergy and receive payment from a Cenergy bank account. Cenergy also processes all payroll for hourly employees at all stores.

The Debtors' operations are managed by Diversified Management Group, Inc. ("DMG"), a non-debtor entity. Mike Buck is the CEO of CCA and manager of both Cenergy and Cenergy II, and is also the CEO of DMG, and oversees its operations. DMG provides upper-level management services for the Debtors and their stores, including employing and managing the store managers and assistant store managers, working with suppliers, vendors, and the franchisee across all stores. DMG also provides human resources, accounting and other operational support to all stores. DMG is paid a management fee, from which it pays payroll, 401k contributions, and benefits like insurance premiums for central management and store managers as employees of DMG. In recent years, DMG has provided additional support to the Debtors beyond its typical management services, including becoming guarantor on several of the Debtors' obligations to facilitate financing. DMG has also deferred collecting its management fees (over and above what is necessary to pay payroll and benefits for managers) to leave more cash with the Debtors for operations.

*(C) Events Leading to Bankruptcy Filing*

The Debtors gross revenues are seasonal, with sales peaking in summer and declining in the winter. In most prior years, increased sales in the summer months would result in overall positive cash flow for the Debtors' fiscal year. However, in 2022, as the summer progressed, management began to see that sales and net revenue were not increasing at the expected pace based on prior years. Following an investigation into causes of the slump in sales and net revenue, the Debtors' management was able to determine that the petroleum inventory purchased wholesale from Holiday Stationstores was not purchased from the lowest price terminal, which was prior practice. As such, the Debtors had been paying more than planned because the retail prices for the gasoline were based on the lowest terminal price per recommendation from Holiday Stationstores. The Debtors sought to address the discrepancy with Holiday to no avail.

Without the expected improvement in net fuel profit from the summer months, the Debtors entered the "off-season" with more accounts payable and less cash reserves than anticipated. The Debtors were able to generate some additional cash by executing sale-and-lease-back transactions for several stores in December 2022 (and in the process pay off approximately $4.5 Million of bank debt). The Debtors also received cash in early 2023 from the Employee Retention Tax Credit of approximately $632,000 and proceeds from a Cenex "equity" payment of $1.6 Million. These influxes of cash in late 2022 and early 2023 helped the Debtors continue operations to the next summer months in 2023, where the Debtors hoped better summer sales

would boost their net revenue. Unfortunately, as the summer unfolded, it became clear that 2023 revenues would be even less than in 2022.

With no line of credit, dwindling cash, and vendors refusing to extend further credit, the Debtors had no choice but to seek bankruptcy relief. As noted above, in order to return to positive cash flows, the Debtors closed 13 underperforming stores shortly after the Petition Date. Those underperforming stores all had negative cash flow, so closure of those stores has resulted in overall better cash flows for the Debtors.

## III. Finances of the Debtors-in-possession and Post-Petition Events

*(A) The Debtors' financial performance during bankruptcy*

From the outset of these Cases, the Debtors have financed their operations using cash collateral, including cash on hand as of the Petition Date, and additional cash generated from operations since the Petition Date. The Debtors did not seek any post-petition debtor-in-possession financing.

Use of cash collateral for operations has been governed by a series of orders, beginning with an interim order entered September 7, 2023 (Dtk. #41), followed by a final order entered September 28, 2023 (Dkt. #75). The initial final order had a termination date of March 2, 2024, though the budget accompanying the motion for use of cash collateral was a standard 13-week budget, so a supplemental budget was filed on December 1, 2023 with another 13-week budget ending March 2, 2024. On February 9, 2024 the Debtors sought an extension of the existing cash collateral order out to June 1, 2024 (Dkt. # 153), which the Debtors anticipate will cover the time needed to obtain confirmation and effectiveness of the proposed Plan. The orders require that the Debtors provide a bi-weekly report of actual versus projected cash levels to any party that requests one. The following are beginning and ending cash balances for each month as reflected in the monthly operating reports filed by the Debtors:

| **Month** | **Beginning cash balance** | **Ending cash balance** |
| --- | --- | --- |
| September 2023 | $176,214 | $864,467 |
| October 2023 | $864,467 | $1,130,818 |
| November 2023 | $1,130,818 | $1,169,767 |
| December 2023 | $1,169,767 | $995,384 |

The steep cash growth in the first month post-petition (September 2023) was generated as the Debtors were able to sell inventory already at the stores, and shift to cash-on-delivery or cash-in-advance terms with vendors. Cash levels dipped a bit during December 2023, which is typical given the seasonality of the Debtors' business, with lighter sales in the winter months. Overall cash levels are stronger than expected, and while the cash flows will ebb a bit more during the winter months, cash is expected to remain at a level sufficient to meet the Debtors' obligations through and including the anticipated Plan Effective Date.

6

*(B) Professionals*

**Attorneys.** The Debtors are represented by Craig E. Stevenson of DeWitt LLP in these Cases to act as general bankruptcy counsel. Employment was approved by the Court during the first month of these Cases.

**Accountants.** The Debtors have applied to have Bauman Associates Ltd. employed as tax accountants, if approved by the Court. Approval of the Court is pending.

**Real Estate Broker.** The Debtors anticipate applying to the Court to employ Acquisition Realty & Development LLC as real estate broker to market and sell certain parcels of real estate owned by the Debtors, as provided for in the Plan.

*(C) Legal Proceedings During these Cases*

Since the Petition Date, the Debtors have taken steps to position themselves for a successful reorganization. The following summarizes the key legal proceedings during these Cases.

On the Petition Date, the Debtors filed first-day motions, seeking authority to use cash collateral (Dkt. #4), pay employee obligations (Dkt. #5), for joint of administration of these cases (Dkt. #6), and to establish procedures to deal with the Debtors' utility providers (Dkt. #21). All of the first-day motions were granted without objection, and the Debtors achieved a smooth transition of their operations into bankruptcy. As noted above, orders providing for use of cash collateral and adequate protection were entered by the Court from the outset of the case and continue to present (the "Cash Collateral Orders").

Also on the Petition Date, the Debtors sought authority to immediately reject leases for the 13 under-performing stores (Dkt. #24), which allowed the Debtors to cease operations at those 13 stores within the first two to three weeks of these Cases. A month later, on October 2, 2023, the Debtors also moved to reject two subleases of Subway restaurant stores in two of the closed locations (Dkt. #82).

On October 2, 2023, the Debtors moved to set the bar date for filing claims (Dkt. #86), and the Court entered an order setting the Bar Date as November 17, 2023 (Dkt. #93).

Also on October 2, 2023, the Debtors gave notice of their intent to abandon the fixtures, furnishings and equipment (FFE) of the closed stores, and sought relief from the automatic stay to permit the secured creditors with interests in the FFE to move forward with a disposition of those assets.

On November 15, 2023, the Debtors filed motions to sell (1) an out lot adjacent to one of the closed stores to the landlord of the closed store, along with a large masthead sign on the lot (Dkt. #113), and (2) the fixtures, furnishing and equipment left behind at one of the closed store locations to the landlord of that store (Dkt. #116). The disposition of these assets were additional steps in the Debtors overall plans to shed the 13 underperforming stores.

There are no pending litigation matters involving the Debtors, either in bankruptcy court, or elsewhere. The Debtors do not anticipate commencing any separate litigation in connection with these Cases, or otherwise.

[Note that the following will be included in the final version of this Disclosure Statement anticipating filing of this motion by the time it is approved:

*On [ * ] the Debtors filed a motion to sell the parking lot parcel adjacent to the Debtors' corporate offices in Eau Claire (Dkt. # [ * ]). As explained in the motion, the cash price is less than the Debtors had anticipated, but the proposed sale ultimately benefits the Debtors given the unique way in which the parking lot parcel is tied into the corporate office lease and a recorded easement that burden that property. The value anticipated with the proposed sale furthers the Debtors' goals of reorganization by monetizing this asset and removing any burden associated with continued ownership by the Debtors*.]

(D) *Other Post-Petition Developments with Holiday and Related Matters*.

As noted above, on the Petition Date, the Debtors operated the majority of their convenience stores as Holiday-branded franchise stores. Following the Petition Date, the Debtors approached Holiday to discuss whether the Debtors would (a) remain Holiday franchisees, provided Holiday would make certain modifications and concessions requested by the Debtors that the Debtors viewed as essential to having profitable operations, and assume the Holiday franchise agreements subject to the agreement to incorporate those modifications going forward; or (b) reject the Holiday franchise agreements, rebrand the Holiday stores, and the parties would go their separate ways as part of the reorganization process.

Ultimately, Holiday and the Debtors agreed that a mutual disengagement of the franchise agreement was the best course. The Debtors had anticipated the potential need to pivot away from the Holiday franchise agreement, and following notification that the relationship would be discontinued, began discussions with alternative fuel suppliers that would perform two functions for the Debtors' going forward operations: (a) provide financial and logistical support to rebrand the existing Holiday stores to another major and nationally-recognized fuel brand, and (b) following the rebranding, provide reliable name-brand fuel to its stores that currently purchase fuel from Holiday. As of the date of this Disclosure Statement, the Debtors have obtained commitments from U.S. Oil, which is currently a supplier of fuel to the Debtors' non-Holiday brand stores. U.S. Oil has agreed to assist with the Reorganized Debtor's transition and rebranding of the existing Holiday stores, but those commitments are conditioned on confirmation of the Debtors' Plan. Existing suppliers of the Debtors' other non-Holiday stores will continue to provide fuel supply under existing contracts to be assumed under the Plan.

A Holiday affiliate, Indianhead Oil, owns five of the Holiday-franchised locations where the Debtors operate. In light of the dissolution of the relationship between Holiday and the Debtors, the Debtors will transition away from operating the five Holiday-owned Stores. While discussions between Holiday and the Debtors are ongoing with respect to the timing and nature of the transition of the five Holiday-owned Stores, the Debtors have agreed with Holiday in principle to the following:

8

    (a) The Debtors will continue operating the five Holiday-owned Stores until the earlier of (1) the Effective Date, or (2) an earlier date when Holiday notifies the Debtors that it does not intend to continue operations at one or more of the five stores; and

    (b) On or about April 1, 2024, Holiday will decide whether to make an offer to purchase (in the form of a proposed asset purchase agreement or similar document) the Debtors' assets located at the five Holiday-owned Stores, including without limitation, the inventory, fixtures, furnishing, equipment, and other similar or related assets. If Holiday does not indicate an intent to purchase those assets by April 1, 2024, then the Debtors may dispose of those assets, including by moving the assets to other locations that the Debtors continues to operate.

Based on the forgoing, following the Effective Date of the Plan and transition of the five Holiday-owned Stores, the Reorganized Debtor will operate its remaining 13 stores going forward.

### IV.    Plan Overview

The Plan provides payment in full on account of all Allowed Secured Claims and Allowed Priority Claims, and distributions to general unsecured creditors substantially more than what those creditors are projected to receive if the Debtors assets were liquidated in chapter 7 proceedings.

To fund distributions to unsecured creditors, the Debtors will immediately list for sale two parcels of real estate and devote proceeds of the sales to payment of unsecured claims. The Debtors also propose to distribute quarterly "Net Available Cash" according to a budget and formula as set forth in the cash flow projections attached to the Plan.

There are no special conditions to the effectiveness of the Plan. The Plan will be effective following confirmation by the Court.

### V.    Classification and Treatment of Claims and Interests

Claims against the Debtors are classified and treated as described below, and in the Plan.

Unclassified claims are described and provided for under Article 3 of the Plan, and include administrative expenses and priority tax claims, which will be paid in full. Allowed Administrative Claims will be paid in full on the Effective Date or as agreed by the parties. The Priority Tax Claim of the Wisconsin Department of Revenue will be paid monthly such that its claim will be fully paid within 60 months of the Petition Date.

**Class 1** includes all allowed Priority Claims, other than the unclassified administrative expenses and priority claims provided for under Article 3. Any such claims will be paid in full on the Effective Date, but the Debtors in good faith do not believe any such claims are payable in these Cases.

**Class 2** consists of the Allowed Secured Claims of Oakwood Bank, SBA, TIAA, CCF and CHS whose claims are unimpaired by the Plan. Holders of Class 2 claims will be paid according to the loan documents between the parties in effect on the Petition Date.

**Class 3** consists of holders of Allowed Secured Claims whose claims are impaired. The Allowed Secured Claims of these creditors will be paid in full with interest according to commercially reasonable terms proposed in the Plan.

In addition, the Plan provides for the sale of two parcels of real estate which are collateral for the Waumandee State Bank Four Properties Note: (1) the Cornell Store (estimated market value of $1,100,000) and the Commercial Blvd Land (estimated market value of $200,000). The Plan proposes to pay Waumandee $600,000 from the sale of Cornell and $50,000 from the sale of Commercial Blvd., with an estimated $530,000 of net cash from those sales to be paid to unsecured creditors. The remaining balance of the Waumandee Four Properties Note will be re-amortized as provided in the Plan.

**Class 4** provides for payment of Allowed General Unsecured Claims from the following sources: (1) net proceeds (estimated to be $530,000) from the sales of the Cornell Store and Commercial Blvd Land real estate as described in connection with the treatment of the Waumandee State Bank claim in Class 3, above, and (2) Net Available Cash as calculated based upon the Cash Flow Projections attached to the Plan as Exhibit B.

**Class 5** provides for treatment of the equity interests in the Debtors. Debtors Cenergy, LLC and Cenergy II, LLC are wholly-owned by Debtor Consumers Cooperative Association of Eau Claire ("CCA"). The three entities will be collapsed and consolidated into CCA, and the Plan provides that all assets of Cenergy and Cenergy II shall vest in CCA as the Reorganized Debtor, and that all assets so vested shall provide for distributions on account of all claims due under the Plan. The holders of equity interests in CCA shall retain their equity interests and all related rights and attributes on and after the Effective Date. Based upon the liquidation analysis (as further described under Part IX of this Disclosure Statement) and the obligations of the Reorganized Debtor under the Plan, as of the Effective Date the equity interests in CCA will have only a nominal value.

## VI.   Treatment of Leases and Executory Contracts

Article 6 of the Plan provides for the assumption and rejection of executory contracts and leases. As noted above, leases for 13 of the Debtors' 31 stores were rejected at the outset of these cases, leaving 18 stores in operation during these Cases. As noted above, the Debtors will reject their contracts and leases with Holiday, including leases with respect to five Holiday-owned Stores. The Debtors also intend to reject, as of the Effective Date, the contracts as set forth on Exhibit D of the Plan.

The leases for the remaining 13 stores will be assumed, as will all other executory contracts not specifically rejected, including suppliers of services and certain vendors. Exhibit C of the plan provides cure amounts (if any) for leases and contracts to be assumed, and the Plan provides a mechanism for counterparties of assumed contracts to object to cure amounts within 30 days following confirmation. All cure amounts must be paid within 90 days of the Effective Date.

10

Article 6 also provides for short-term injunctions following the Effective Date to allow the Reorganized Debtor to transition the five Holiday-owned Stores, and to rebrand the remaining Transition Stores. The relationship between the Debtors and Holiday has been cooperative throughout these Cases, and while the Debtors anticipate that to continue, these provisions provide reasonable post-confirmation timetables for the Reorganized Debtor to complete the transitions and the option for either party to seek relief in the Court in the event post-confirmation disagreements arise about the transitions of the Holiday-owned Stores and the Transition Stores.

### VII. Means of Implementing the Plan and Feasibility

*(A) Funding the Plan and Feasibility*

Article 7 of the Plan describes the means for implementation of the Plan. The Plan's implementation depends on (a) the sales of two parcels of real estate to generate an estimated $530,000 of net proceeds payable to general unsecured creditors, and (b) the Reorganized Debtor's operational income and net cash flows to pay secured and priority claims, and to fund additional distributions to general unsecured creditors to be paid on a quarterly basis for three years following the Effective Date.

The Plan provides for the sale of two parcels of real estate: (1) the Cornell Store (estimated market value of $1,100,000) and the Commercial Blvd Land (estimated market value of $200,000). The Cornell Store is anticipated to be sold via a sale-and-leaseback transaction which will facilitate the liquidation and distribution of the equity in that real estate, while allowing the Reorganized Debtor to retain the benefit of positive cash flow from continued operations at the Cornell Store. While both parcels are fully encumbered by mortgages in favor of Waumandee State Bank, the Plan proposes to pay Waumandee $600,000 from the sale of Cornell and $50,000 from the sale of Commercial Blvd., leaving an estimated $530,000 of net cash from those sales to be paid to unsecured creditors. The Debtors' management anticipates that those sales and distributions will be completed by August 31, 2024.

Currently, the Debtors operate a total of 18 stores, of which 13 are Holiday-brand stores. As noted above, five of the 13 Holiday-brand stores are owned by Holiday affiliate Indianhead Oil (defined in the Plan as the "Holiday-brand Stores"). Shortly after the Effective Date, the Debtors will cease operating the five Holiday-brand Stores, leaving the Reorganized Debtor with 13 stores continuing in operation. Of those remaining 13 stores, eight stores are currently Holiday-brand franchise stores, and will be rebranded with the assistance of new fuel supplier U.S. Oil beginning shortly after the Effective Date, with the rebranding to be completed within 90 days or less following the Effective Date. The eight stores to be rebranded from Holiday to a new brand are referred to in the Plan as the "Transition Stores."

The Debtors' management, primarily CEO Mike Buck and VP of Finance Jake Day, have prepared cash flow projections for three years following the Effective Date (the "Cash Flow Projections"), which are attached to the Plan as Exhibit B. The Cash Flow Projections are based on the recent historical performance of the Debtors' stores, including seasonal fluctuations. The Cash Flow Projections incorporate data for the 13 stores that the Debtors will operate after the Effective Date (following transition of the five Holiday-owned Stores).

11

The Cash Flow Projections include all obligations due under the Plan, and thus demonstrate the feasibility of the Plan under Sec. 1129(a)(11). The Cash Flow Projections also provide projected amounts of Net Available Cash to make distributions to holders of General Unsecured Claims under Article 4 of the Plan

**Please Note: the Cash Flow Projections represent a good-faith effort by the Debtors and their management to provide an accurate forecast of performance; however, these projections are estimates and not a guaranty of performance.**

*(B) Risks*

Although the Debtors believe in good faith that the Plan is feasible and that the Cash Flow Projections are accurate estimates, there are certain risks that the Reorganized Debtor will not be able to fully-perform under the Plan. The Debtors' convenience store operations are impacted by inventory prices, including primarily the fluctuation in prices of gasoline and diesel fuels, as well as macro-economic factors impacting demand and sales. The Debtors' convenience stores operate in a very competitive market environment, and the entry into the Debtors' markets by competitors could impact demand and sales at the Debtors' stores.

*(C) Management after the Effective Date.*

After the Effective Date, the management of the Reorganized Debtor will remain the same as before the Petition Date and during these Cases, with Mike Buck continuing as CEO and Jake Day as VP of Finance. The Plan provides that DMG will continue in its role managing the operations, and Mr. Buck will be responsible on behalf of the Debtors for the execution and implementation of the Plan.

Mr. Buck, Mr. Day and DMG serve at the pleasure and discretion of the CCA board of directors. Directors are elected on an annual basis, with the most recent election to occur on March 7, 2024.

(D) *Injunction and Exculpation.*

**The Plan provides an injunction against the commencement or continuation of any claims against the Debtors and certain Related Entities, other than enforcement of the Plan's terms.**

**The Plan also provides for exculpation of the Debtors and certain identified individuals from liability arising out of the Cases, or confirmation, consummation and administration of the Plan, and a "gatekeeper" function whereby any party wishing to commence an action against any Exculpated Party must first seek permission of the Court before filing such an action.**

These provisions are narrowly tailored to comply with the Seventh Circuit's holding in *In re Airadigm Communications, Inc.*, 519 F.3d 640 (7th Cir. 2008). The exculpation provision excludes willful misconduct, and provides a "gatekeeper" function to allow a party believing in good faith that it may bring a claim to seek permission to so in the Court. The purpose of the injunction and exculpation provisions is to avoid harassment actions, and to prevent spurious lawsuits following the conclusion of these Case, due to conduct during these Cases. *See, e.g., In*

12

*re Berwick Black Cattle Co.*, 394 B.R. 448, 459 (Bankr. C.D. Ill. 2008) ("As one court has explained, the now customary exculpation for acts and omissions in connection with the plan and the bankruptcy case requires, in effect, that any claims in connection with the case be raised in the case and not saved for future litigation. The court was careful to note that the release did not extend back in time to prepetition activities. Where such releases exculpate only negligent conduct that occurs during the bankruptcy case, relating to the plan or other aspects of the bankruptcy case, they have been found to be 'reasonable and customary and in the best interests of the estates.'") (Internal citations and quotation marks omitted.)

## VIII. Voting and Confirmation of the Plan

**Ballots & Voting.** Creditors are asked to indicate acceptance or rejection of the Plan by voting in favor of or against the Plan on the Ballot. The Ballot form is attached as **Exhibit 1** to this Disclosure Statement. As noted on the Ballot instructions, creditors are directed to return the Ballot so that it is *received* no later than the date stated on the Ballot, which is **[ * ].**

If a creditor votes against the Plan, abstains from voting, or is the holder of an unimpaired claim under the Plan, such creditors may still be bound by the Plan if it is accepted by the requisite number of creditors.

Creditors with any questions regarding the balloting procedure, or any creditor that did not receive a Ballot, received a damaged Ballot, or lost a Ballot, may contact Debtors' counsel, Craig Stevenson, at 608-252-9263, or by email at ces@dewittllp.com.

**Hearing on Confirmation.** At the hearing on the confirmation of the Plan, the Court will determine, among other things, whether the Plan has been accepted by each impaired Class of Creditors. The Court has scheduled a hearing on confirmation of the Plan for **[ * ] at [ * ] a.m./p.m.,** with objections, if any, to confirmation of the Plan due on or before **[ * ].**

**Confirmation of Plan with or Without Necessary Acceptances.** To confirm the Plan, the Court must find that the Plan complies with Section 1129 of the Bankruptcy Code, which sets forth the requirements for plan confirmation. Among other requirements, Section 1129 requires that confirmation of the Plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor…" This provision requires the Court to find that the proposed Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan while continuing operations. Section 1129 also requires that a plan be in the "best interests" of impaired and dissenting holders of claims and interests. The "best interests" test generally requires that the value of the distributions to impaired and dissenting holders of claims and interests under a plan may not be less than those parties would receive if a debtor were liquidated under a hypothetical case occurring under chapter 7 of the Bankruptcy Code. The Liquidation Analysis under Article IX discusses in more detail how the Plan satisfies the "best interests" requirement of Section 1129.

A plan may be confirmed under Section 1129(b) even if it is not accepted by one or more classes if (a) the plan is accepted by at least one impaired class of claims, and (b) the court finds that the plan does not discriminate unfairly against, and is fair and equitable as to each impaired class which has not accepted the plan.

If the requisite number of creditors do not vote to accept the Plan, the Debtors may seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.

## IX. Liquidation Analysis

As noted above, to confirm the Plan the Court must find that the Plan is in the "best interests" of any impaired and dissenting classes of claims, meaning the creditors holding such claims would receive more under the Plan than if the Debtors were instead debtors subject to liquidation under chapter 7 of the Bankruptcy Code. As reflected in the Liquidation Analysis attached as Exhibit A to the Plan, in a chapter 7 liquidation holders of General Unsecured Claims would likely receive nothing on account of their claims.

(A) *Value of the Debtors' assets*.

The Liquidation Analysis includes categories and valuations of the Debtors' assets.

Cash and depository accounts, as well as prepayments and inventory, are shown at full value. Ordinary receivables are shown at 90% value (estimate of 10% potentially uncollectable), and vendor rebates at 75% value (estimate of 25% uncollectable or ineligible for payment).

The Debtors' inventory consists of fuel and stock in the stores. Inventory values are estimated at just over 50% of cost, based on analysis by the Debtors' management of likely recoveries on different categories of inventory ranging from petroleum/fuel inventory (70% recovery) to perishable and prepared foods (10% recovery), and weighted according to the value of each category of inventory on hand.

Fixtures, furnishing and equipment consists of shelving, un-installed coolers, food service items, and gas pumps at the stores. The values are from the 18 stores still in operation as set forth in the Debtors' schedules, less a 25% reduction if the stores are no longer operating and/or the items must be removed and transported by the buyer.

Real estate values for currently-operating stores are discounted to 60% of estimated fair market value based on the assumption that a chapter 7 trustee would not operate the stores, and based on the current market for similar stores in the area (including stores recently closed by the Debtors). The Commercial Blvd. land is a vacant lot. The Parking Lot property is the subject of a letter-of-intent (LOI) recently received by the Debtors, so the LOI offer price for that parcel is included. The Debtors anticipate moving the court under Sec. 363 for approval of a sale pursuant to a purchase agreement anticipated to follow the LOI.

(B) *Other liquidation costs and consideration*.

If the Debtors' assets were liquidated, a trustee in a hypothetical liquidation would need to employ and pay professionals to assist in liquidating the collateral, such as an auctioneer. The trustee is also entitled to compensation for administering and liquidating the assets. These costs may further reduce the net liquidation value of the assets.

(C) *Claims secured by the Debtors' assets.*

In a liquidation, before anything can be distributed on account of unsecured claims, creditors holding claims secured by the Debtors' assets must be paid in full from the proceeds of any sale of those assets. The Liquidation Analysis includes the claims of Oakwood Bank, the SBA and Citizens Community Federal bank, all of which have blanket liens by virtue of general business security agreements perfected with UCC financing statements. Chambers & Owens, Inc. has a lien in inventory for its claim, and KLC Financial, Inc. has asserted a lien in equipment and related assets for its secured claim. TIAA has a perfected lien the Debtors' Isuzu refrigerated delivery truck.  Waumandee State Bank has mortgages in all of the Debtors' real estate except the Parking Lot parcel. In addition, Waumandee established an escrow account in connection with the Debtors' purchase of the Lake Hallie Store, and use of those funds is restricted to making improvements of that store. If the Debtors' real estate were liquidated, the Debtors anticipate that Waumandee would apply the funds in escrow to reduce the balance due on the Lake Hallie Note.

(D) *Potential clawback claims under Chapter 5.*

In a hypothetical liquidation, a chapter 7 trustee would be empowered to investigate, and where deemed appropriate, pursue recovery of claims under Chapter 5 of the bankruptcy code, including preferential payments and fraudulent transfers. The Debtors disclosed on their statement of financial affairs a number of payments made to creditors within the 90 days prior to filing, payments made to insiders within 1 year of filing, and other transfers made within 2 years of filing. The Debtors' professionals have analyzed the potential for recovery of any payments or transfers disclosed, and determined most if not all of the transfers would not be recoverable, or would be subject to defenses such that all or a significant portion of the transfer would not be avoidable or recoverable. The Plan proposes estimated payments of over $600,000 to general unsecured creditors, which exceeds any prospect of recovery on any Chapter 5 claims. Thus, the general unsecured creditors will receive more under the Plan than they would from any recoveries under Chapter 5 (if any) in a chapter 7 liquidation.

**X.    Plan Tax Consequences and Considerations**

The Debtor does not believe there will be any material tax consequences as a result of the Plan. To the extent any creditors are not paid in full, creditors may have a tax deduction. Creditors should consult with a tax expert to analyze the potential tax effects on them as a result of the Plan. Both Cenergy, LLC and Cenergy II, LLC are single member LLCs owned by CCA, so they are disregarded entities for tax purposes. CCA is taxed as a C-corporation, but does not anticipate tax obligations from any of the activities described in the Plan.

**XI.    Reorganized Debtors' Ownership and Management**

As noted above, Debtors Cenergy, LLC and Cenergy II, LLC are wholly-owned by Debtor Consumers Cooperative Association of Eau Claire ("CCA"). The three entities will be collapsed and consolidated into CCA. The Plan provides that all assets of Cenergy and Cenergy II shall vest in CCA as the Reorganized Debtor, and that all assets so vested shall provide for distributions on account of all claims due under the Plan. The collapse of the three entities into CCA merely reflects the realities of the Debtors operations: the three Debtors operate as one

enterprise, with consolidated financials, cash management, and a single tax return. Collapsing the entities in CCA as the Reorganized Debtor will facilitate fairness and clarity dealing with creditors and other parties going forward.

As also noted above regarding treatment of Class 5, the holders of equity interests in CCA shall retain their equity interests and all related rights and attributes on and after the Effective Date. Based upon the liquidation analysis (as further described under Part IX of this Disclosure Statement) and the obligations of the Reorganized Debtor under the Plan, as of the Effective Date the equity interests in CCA will have only a nominal value. The Plan does not provide for, nor do the Debtors anticipate, any change to the current management and ownership structure of the Debtors following the Effective Date. The Plan does not provide for any issuance of new classes of equity or ownership. The Reorganized Debtor will continue to hold all rights and title in the Debtors' assets, which will provide a benefit to the creditors through continued operations and distributions under the Plan.

### XII. Allowance and Disallowance of Claims; Disputed Claims

Article 5 of the Plan provides that, if any objection is made to the allowance of a claim, and the objection is pending on the date that payments or distributions are to be made under the Plan, then no payment or distribution shall be made to such creditor until an order of the Court determining the validity and amount of such claim is entered and no longer subject to further review or appeal, at which time such payment and distribution of the amount, if any, awarded such creditor shall be made according to the order so entered. Unless the Court orders otherwise, objections to claims must be filed and served within 60 days after the Effective Date.

### XIII. Effect of Confirmation

Except as otherwise provided in the Plan or an order confirming the Plan, as of the Effective Date, all of the property of the Debtors' estates is vested in the Reorganized Debtor free and clear of all claims and interests of creditors. Under Section 1141 and the Plan, all Claims against the Debtors are discharged except as provided in the Plan. Until the Effective Date, the automatic stay provisions of Section 362 of the Bankruptcy Code remain in effect.  The provisions of the Plan shall be binding upon the Debtors and all creditors, whether or not any such creditor has accepted the Plan, and regardless of whether the claims of such creditor are impaired under the Plan.

### XIV. Conclusion

The Debtors' management and advisors believe that the Plan is in the best interests of all parties. The Plan represents the best opportunity for the general unsecured creditors to receive payment on account of their claims. If the Plan is not approved, and the Debtors' assets are liquidated under chapter 7, general unsecured creditors will likely receive nothing on account of their claims. The Plan represents the best efforts of the Debtors to reorganize their financial affairs, and the Plan's terms meet or exceed all requirements for confirmation under the Bankruptcy Code. For these reasons, the Debtors request that the creditors vote in favor of the Plan.

**DeWitt LLP**

By: */s/ Craig E. Stevenson*
    Craig E. Stevenson (#1060082)
    Two East Mifflin Street, Suite 600
    Madison, WI  53703-2865
    608-252-9263 (accessible remotely)
    ces@dewittllp.com

    Counsel for the Debtors

**EXHIBIT 1: PROPOSED FORM OF BALLOT**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

In re:

Cenergy, LLC, *et. al.*,

Case No. 23-11558-cjf
Chapter 11

Debtors[1].

**[PROPOSED] BALLOT FOR ACCEPTING OR REJECTING CHAPTER 11 PLAN**

The Debtors filed a Joint Chapter 11 Plan of Reorganization (the "Plan") dated [February 26, 2024]. The Court approved the Debtors' Disclosure Statement following a hearing held on [April 5, 2024]. Court approval of the Disclosure Statement does not indicate the Court's approval of the Plan. If you hold claims or equity interests in more than one class, you will receive a ballot for each class in which you are entitled to vote. **You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan.**

If your ballot is not received by counsel for the Debtors, at the address below, on or before **[ * ]**, unless such deadline is extended by an order of the Court, your vote will not count as either an acceptance or rejection of the Plan. If the Plan is confirmed by the Court, the Plan will be binding on you whether or not you vote to accept the Plan.

**ACCEPTANCE OR REJECTION OF THE PLAN**

Creditor, _____ (insert name), the holder of a claim against (check one box only) [ ] *Cenergy, LLC*   [ ] *Cenergy II, LLC*,
[ ] *Consumers Cooperative Association of Eau Claire*   hereby votes to (check one box only):

**[ ] ACCEPT THE PLAN          [ ] REJECT THE PLAN**

Signature: _____

Print or type name: _____

Title (if applicable): _____

Date: _____

Address: _____
_____
_____

| **RETURN THIS BALLOT TO:** |
|---|
| Craig E. Stevenson |
| DEWITT LLP |
| Two East Mifflin Street, Suite 600 |
| Madison, WI 53703-2865 |
| |
| or |
| |
| ces@dewittllp.com |

---

[1] Jointly administered with Case No. 23-11559 *Cenergy II, LLC*, and Case No. 23-11560 *Consumers Cooperative Association of Eau Claire*.